**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Case No. 1:23-cr-19-CKK |
| PAUL EDWALD LOVLEY, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

**I.   INTRODUCTION**

Paul Lovley, by and through undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing. Mr. Lovley comes before this Court humbled and remorseful for his actions, following his acceptance of responsibility upon entering a plea of guilty to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Mr. Lovley's actions on January 6, 2021, weigh heavily on his mind, and his regret and remorse are sincere and genuine.

*Sentencing Request*

Based upon Mr. Lovley's personal history and characteristics, the nature and circumstances of the offense, his lack of criminal history, and the almost nonexistent likelihood of recidivism, Mr. Lovley respectfully requests that the Court impose a probationary sentence in this matter, as it would be "sufficient, but not greater than necessary" to achieve the legitimate purposes of sentencing. *See* 18 U.S.C. § 3553(a).

**II.   MR. LOVLEY'S BACKGROUND**

Mr. Lovley is a twenty-four (24) year old young man from California who grew up in a stable middle-class family. *See* PSR at ¶ 38. He maintains good relationships with his family and

1

moved to Maryland for employment after college, where he graduated *cum laude* from California State University – San Bernadino with a degree in Information Systems and Technology with a Cybersecurity focus. *Id*. at ¶ 42 and ¶ 49. Because of Mr. Lovley's involvement in the instant offense, his professional life has suffered greatly, but he has since moved to a different state for a new job and is doing his best to move forward. *Id*. Mr. Lovley has no history of alcohol or substance abuse, no criminal history, and aside from this offense, has lived an unblemished life. *See generally* PSR.

### III.     18 U.S.C. § 3553(A) FACTORS

#### A.  The Nature and Circumstances of the Offense.

Mr. Lovley's involvement in the instant offense is extraordinarily regrettable. As he writes in his eloquent letter to the Court, "it is immensely disappointing that what should have been a peaceful demonstration on behalf of election integrity turned into a violent riot, and I sincerely regret my participation in it." *See* Exhibit A. Mr. Lovley understands that although he "was not personally violent or destructive," that his presence did not help "de-escalate" the situation and that his actions "did not happen in a vacuum." *Id*. More importantly, he does not use the excuse of being "caught up in the moment," or being influenced by a "mob mentality." *Id*. In fact, he tells the Court that while he was "'caught up in the moment' to an extent, [he] still had [his] wits about [him] enough to know not to participate in any violence, destruction, etc., and [he] therefore knew better than to enter a government building without receiving an explicit invitation and undergoing proper security screening …" *Id*. Mr. Lovley has reflected long and hard on his actions, and he fully understands that "remaining peaceful while inside would not magically negate the illegality of entering to begin with …" *Id*. He explains that he did not come to "DC out of malice," or with any "bizarre ulterior motive," and that he did not come there to

assault anyone or "impede Congress' work." *Id*. He accurately distinguishes his actions from those who engaged in much more severe behavior without excusing his own unlawful conduct. *Id*.

The collateral consequences Mr. Lovley faced because of his actions have been extremely severe, especially considering he did not engage in any violent or destructive conduct. Mr. Lovley lost three jobs, the most important being his government job he worked so hard to get and for which he moved to Maryland. *Id*. In addition to losing three jobs, Mr. Lovley recounts in his letter how he had to move two times, how strangers have shown up to his home to harass and stalk him, how he lost relationships that meant a lot to him, and how he feels a constant state of anxiety about what could happen to him. *Id*. These experiences "have led [him] to understand on a deep, profound level that [his] actions were not warranted or justified, and that poor choices carry with them harsh consequences." *Id*. He understands wholeheartedly that "all [he] can do is take responsibility for [his] actions, learn from this experience, and move on with [his] life." *Id*. Despite all these consequences, he remains positive and "eager to continue being a peaceful, productive, law-abiding member of society." *Id*.

### B.  Mr. Lovley' History and Characteristics.

Paul Lovley is beloved by his family and friends as evidenced by the numerous letters of support submitted on his behalf. *See* Exhibits B-F. The letters submitted on his behalf paint the portrait of a man who is well respected, loved, and admired for his kindness, hard work, and dedication to his community. *Id*.

Jack and Anne Lovley, Mr. Lovley's parents, write a heartfelt letter to the Court, painting a picture of a son whom they love dearly and who was raised with the right morals. *See* Exhibit B. Ever since he was a young child, Mr. Lovley excelled at school and was identified as a

"GATE student" and was placed in Gifted and Talented programs where he made "honor roll every year." *Id*. Mr. Lovley's parents tell the story of how Mr. Lovley, while in the 6th grade, "raised and cared for a rabbit" despite being allergic to it. *Id*. They firmly believe this had a "profound impact on him and his personality, in that it taught him how to take responsibility for the wellbeing of creatures and contributed greatly to his gentle and caring nature as an adult." *Id*. This love of rabbits developed into Mr. Lovley volunteering throughout his life at rabbit rescue facilities. *Id*. As he entered high school, Mr. Lovley was accepted into the Early College Program (ECP), where he earned college credits throughout high school, and earned an associate's degree by the time he was eighteen (18). *Id*. He went on to earn his four-year college degree in three years, and moved to Maryland soon after to work for the government. *Id*.

Mr. Lovley's parents said this about his actions on January 6th – "what he did that day was not only illegal, but it was also morally wrong, and he knows it." *Id*. The collateral consequences have been very real for Mr. Lovley. "Because of his poor judgment he has suffered the loss of 3 different jobs, a nearly two-year long relationship, and has experienced such high levels of stress for such a long period that we're amazed that he continued to push forward." *Id*. They tell the Court that they are "extremely saddened by what occurred and everything that has transpired…" *Id*. This ordeal changed Mr. Lovley's perspective on life, and he has spoken to his parents on multiple occasions about what occurred. *Id*. In their words, "he ultimately just wants to accept responsibility, make changes to ensure that nothing like this ever happens again, get past the sentence that is coming and just focus on working and providing for himself." *Id*. Despite their forgiving love of their son, they do believe that "even those like Paul that remained peaceful need to be held accountable for contributing to the chaos." *Id*. They have made it a "point to teach our children to admit when they are wrong, take responsibility for their actions,

4

and make corrections to ensure that they do not repeat their mistakes." *Id*. They firmly believe that "he will go back to being an upstanding citizen" once this is behind him. *Id*. Mr. Lovley is a "good man with a good heart," and is a "kind, gentle, loving, honest, and trustworthy young man that loves his God, loves his country, loves his family and friends, and will recover from this and go on to be a law-abiding, productive member of society…" *Id*.

Mr. Lovley's parents are not the only ones who feel such pride and confidence in his upstanding character. A friend for over a decade, Austin Fischer, writes that that Mr. Lovley "embodies diligence, integrity, and accountability." *See* Exhibit C. Mr. Fischer also considers Mr. Lovley a dear friend, and tells the Court how Mr. Lovley has "been there with [him] through thick and thin, even at my absolute lowest," and how he has been a constant "good influence" in his life. *Id*. Mr. Fischer strongly believes that Mr. Lovley's involvement in the instant offense does not reflect "his true character." *Id*. Mr. Fischer knows firsthand that "this ordeal has deeply affected him," and it pained Mr. Fischer to see his friend's "mental state suffer because of what's happened." *Id*. Nevertheless, Mr. Fischer knows that Mr. Lovley's "future holds immense promise," and he "will rely on him with unwavering trust and confidence" going forward. *Id*.

Remington Rahn, another close friend of Mr. Lovley who lived with him for awhile, describes their time growing up together as a "blessing." *See* Exhibit D. In their friend group, Mr. Lovley was "one of the last people I'd ever expect to run into trouble with the law." *Id*. He tells the Court how Mr. Lovley's remorse echoes strong, and that "he still occasionally talks about how he regrets doing such a stupid thing, and would go back in time to change what he did in a heartbeat." *Id*. Mr. Rahn cares for his friend and believes the collateral consequences Mr. Lovley's has already faced are more than enough punishment. *Id*.

Perhaps one of the most intriguing letters is from Mr. Lovley's high school principal Terri Gusiff, who worked in the field of education for 20 years and just recently retired. *See* Exhibit E. While she understands that someone's conduct in high school "would usually not be relevant to a criminal proceeding," she witnessed Mr. Lovley's "exemplary behavior translate well from youth to adulthood, and given his age at the time of the offense," thinks her perspective can shed some light. *Id*. She describes Mr. Lovley as a "model student" with a high degree of "moral character" who was "responsible, mature, quiet, humble, kind, conscientious, hardworking, and goal oriented." *Id*. Ms. Gusiff believes the aforementioned qualities hold true today despite Mr. Lovley's involvement in the instant offense, and knows he "has learned a great deal" but will "emerge a better person" because of this aberrational event. *Id*.

Harkins Builders is a construction company in Columbia, Maryland where Mr. Lovley worked from January through September of 2022. *See* Exhibit F. This is the same company that unfortunately decided to let Mr. Lovley go due to his involvement in the instant offense, but a Director from Harkins, Patrick Hennessy, still decided to write a letter on behalf of Mr. Lovley. *Id*. Mr. Hennessy worked with Mr. Lovley for only nine (9) months, but in that time, came to know Mr. Lovley as "a very quiet and humble individual who performed his work on time and with exceptionally quality." *Id*. Mr. Lovley soon became "an extremely valuable asset to our business," and an "A+ caliber employee." *Id*. After the company decided to let Mr. Lovley go, Mr. Hennessey said "it was difficult to watch someone who had been a top performer and an even better person … have his life upended." *Id*. He believes Mr. Lovley is man who deserves a second chance, and he "wholeheartedly believes in his [Mr. Lovley's] ability to learn from this mistake, to grow as an individual, and to put this experience behind him and move forward as a productive member of society." *Id*.

It is clear that Mr. Lovley is a man of great values and great promise who recognizes that he made the worst decision of his life on January 6, 2021. A probationary sentence is appropriate in Mr. Lovley's case.

### C. Mr. Lovley Poses Little or No Risk of Recidivism

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured. Fortunately, Mr. Lovley does not fit the archetype of a person who will commit new criminal offenses or recidivate. And because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's findings that "there is no correlation between recidivism and Guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected as the Guidelines' offense level has long been recognized as not intended or designed to predict recidivism." *U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*). Accordingly, *Booker* has freed the judiciary to remedy this inconsistency.

In addition to what has already been described about Mr. Lovley's character, the Commission has also objectively quantified his low likelihood of recidivism. For example, the Sentencing Commission's study confirms that recidivism rates decline as education level increases. *See Measuring Recidivism* at 12. More specifically, with respect to Mr. Lovley, who holds a bachelor's degree, the statistics show that defendants who are college graduates with no

7

criminal history have a recidivism rate of only 7.1 %. *Id.* at 29. There is, quite simply, nothing in the record to indicate that Mr. Lovley would commit any criminal offense in the future.

The Commission has also found that first offenders like Mr. Lovley are rarely reconvicted of a crime. In fact, only 3.5% of first offenders with zero criminal history points are ever reconvicted. *U.S Sentencing Comm'n, Recidivism and the First Offender* at Exhibit 6 (May of 2004) (hereinafter *First Offender*). Additionally, beginning in November, 2023, the Amendments to the U.S.S.G will take effect, and individuals with zero criminal history points will be credited with a two-level reduction from the offense level. *See Amendments to the Sentencing Guidelines*, (April 27, 2023), at 78 (*available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf). Although the guidelines are not applicable in Mr. Lovley's case, it is important to note the policy changes to be implemented for individuals with zero criminal history points.

Beyond the statistics, Mr. Lovley personally presents no risk of recidivism. As detailed by his family and friends, Mr. Lovley has lived his life guided by principles completely incongruous with his actions on January 6, 2021. Moreover, regardless of the sentence imposed by this Court, Mr. Lovley has already faced devastating consequences as a result of his actions and arrest. His professional and personal life are forever changed, and his actions on January 6 will remain a dramatic aberration for the rest of his life. As such, the requested sentence of probation is appropriate to serve as an adequate deterrent to Mr. Lovley and protection for the public.

### D. The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants.

The Court must consider the need to avoid unwarranted sentence disparities among defendants with similar criminal histories convicted of similar criminal conduct. *See* 18 U.S.C § 3553(a)(6); *see also United States v. Parris*, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008). It is especially important to consider this factor when it comes to the January 6 cases because of the vast array of conduct and character differences among defendants. Unlike many other January 6 defendants, Mr. Lovley made no incendiary comments online or social media posts in the days before January 6, 2021, nor did he proudly promote his participation in the riot afterwards as did many other defendants. Mr. Lovley did enter the Capitol for approximately 30 minutes, but did not engage in any violent, aggressive, or destructive behavior, neither in word nor deed, as did many other defendants. In fact, when one of Mr. Lovley's co-defendants entered the Senate chamber, he did not follow suit; and when members of his group took media equipment that had been ransacked, he did not partake. *See* PSR at ¶ 18, 21 and Statement of Offense. It is important to note that Mr. Lovley did not force his way into the Capitol building or climb through a broken window. He did not barge past officers or travel through clouds of tear gas. Instead, along with hundreds of others, he walked through an open door.

These distinctions are important not to minimize Mr. Lovley's culpability, but to contrast his actions with more egregious behavior of many other defendants and properly place his conduct on the spectrum of January 6 defendants. For example, in *United States v. Boyd Camper*, 1:21-cr-325-CKK, the government requested, and this Court imposed a 60-day sentence of incarceration. In analyzing Camper's conduct, he "pushed to get inside the building," thought that he and others were "going to take the Capitol steps," and destroyed audio recordings containing his statements during the riot. *Id.* at Dkt. No. 24. In *United States v. Oliver Sarko*,

9

1:21-cr-591-CKK, the government requested, and this Court imposed a 30-day period of incarceration. "Sarko livestreamed footage of himself walking into the Capitol Building," and made statements such as "Where are the traitors?," "We won't let you steal this country," and "We're actually breaking in right now." *Id*. at Dkt. No. 24. In *United States v. Janet Buhler*, 1:21-cr-510-CKK, the government requested, and this Court imposed 30 days of incarceration where she "cheered and applauded when the rioters eventually broke through the East Rotunda Doors," and actually entered the Senate gallery. *Id*. at Dkt. No. 25.

Mr. Lovley did not destroy evidence, did not make statements claiming there were traitors in the building, and did not actually enter the chambers of Congress. These are again, important distinctions that provide context for why Mr. Lovley's conduct falls far below that of those defendants described above who received sentences of incarceration from this Court, and why Mr. Lovley should receive a probationary sentence.

### E.  Mr. Lovley's Public Demise Serves as Adequate Deterrence to Others.

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct."  There is no need for personal deterrence in this case, as Mr. Lovley is not the type of person who would commit any further crimes in the future. Mr. Lovley has absolutely no criminal history, and this experience has been a defining moment in his life. Arguably, the government already substantially achieved the maximal deterrent effect of Mr. Lovley's offense simply by charging and convicting him. As a result, numerous media outlets will discuss Mr. Lovley and the substance of his offense, as they have done throughout the pendency of this matter. Further, Mr. Lovley will be discussed in various conversations and settings among family and friends and within certain professional environments for years to come, a shameful reality from which he simply cannot escape. In

short, Mr. Lovley's public and professional demise sends a strong message to anyone who might attempt such conduct in the future.

## IV. CONCLUSION

In light of the above, Paul Lovley, by and through undersigned counsel, respectfully requests that the Court impose a probationary sentence.

Respectfully submitted,

_____/s/_____
David Benowitz
Bar # 451557
*Counsel for Paul Lovley*
Price Benowitz LLP
409 7th Street, NW, Suite 200
Washington, DC 20004
O: (202) 417-6000
M: (202) 271-5249
F: (202) 664-1331
David@PriceBenowitz.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of June 2023, I caused a true and correct copy of the foregoing Defendant's Memorandum in Aid of Sentencing to be delivered via CM/ECF to all parties in this matter.

_____/s/_____
David Benowitz